J-A15016-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| RICHARD A. SPRAGUE, ESQUIRE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JILL PORTER, PHILADELPHIA NEWSPAPERS, LLC, PHILLY ONLINE, LLC, PMH ACQUISITION, LLC, PHILADELPHIA MEDIA HOLDINGS, LLC | |
| Appellees | No. 1649 EDA 2013 |

Appeal from the Order Entered May 17, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 2930 January Term, 2010

BEFORE:  PANELLA, J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:               **FILED AUGUST 26, 2014**

Richard A. Sprague, Esquire, appeals from the order of the Court of Common Pleas of Philadelphia County, which granted summary judgment in favor of Jill Porter, Philadelphia Newspapers, LLC, Philly Online, LLC, PHM Acquisition, LLC and Philadelphia Media Holdings, LLC.  We affirm based on the thorough opinion of the Honorable Lisa M. Rau.

The trial court set forth the underlying facts of this case as follows:

Philadelphia Attorney Richard A. Sprague (Appellant) represented his friend State Senator Vincent J. Fumo during a federal investigation and prosecution for public corruption and obstruction of justice.  Senator Fumo was charged, among other things, with deleting emails and wiping computer hard drives during the federal investigation.  On February 8, 2007, Mr. Sprague called a press

---

[*] Retired Senior Judge assigned to the Superior Court.

conference and stated that his client had "sought advice from a lawyer – not me – on whether to change his policy" before deleting emails during the federal investigation. Sometime later, Mr. Sprague's personal and professional relationship with Senator Fumo changed and they parted ways. In February 2009, Mr. Sprague was called by the prosecution at Senator Fumo's criminal trial. Mr. Sprague testified that notwithstanding what he said at the press conference two years earlier, he had never believed Senator Fumo's claim of having relied upon legal advice when he purged emails: "Did I believe it? Of course not."

***Philadelphia Daily News*** reporter Jill Porter had been covering the public corruption trial in her weekly column from the beginning. She attended the earlier press conference and the trial. Two days after Mr. Sprague's trial testimony, Ms. Porter wrote, "Sprague, once Fumo's beloved mentor and best friend, labeled Fumo a liar when he testified at Fumo's trial this week. But he acknowledged that he was something of a liar, too." Ms. Porter quoted Mr. Sprague's statements two years earlier at the press conference when he said Senator Fumo had relied upon a lawyer's advice in deleting the emails. She then quoted his recent trial testimony when he admitted that he had never believed the story he told about Senator Fumo's defense at the press conference. Ms. Porter posed questions in her column about Mr. Sprague's conduct:

> "So one of the most powerful attorneys in Philadelphia believes that it's acceptable to deliberately mislead the public on behalf of a client?
>
> That it's appropriate to vigorously perpetrate an untruth, as part of his legal obligation?"

***See*** Ct. Ex. A, Jill Porter, ***The law, duty, and truth***, PHILA. DAILY NEWS, Feb. 20, 2009, at 6, 12, attached; Def's Mot. Summ. J. Ex. 4. Ms. Porter answered the questions by writing that "Sprague's posturing on Fumo's behalf may not be officially unethical" but "it sure *seems underhanded and immoral to me*." ***See id.*** (emphasis provided).

In response, Mr. Sprague filed suit for defamation and false-light invasion of privacy against Ms. Porter and the ***Daily News***' entities (Appellees) that published the column on January 26, 2010. After discovery was complete, the Appellees moved for summary judgment and argued that Mr. Sprague failed to produce the legally required evidence that the published statements were false or not opinion, that they were made with malice, and that he suffered any

- 2 -

damages. On May 17, 2013, this [c]ourt granted summary judgment on all four grounds because there was not sufficient evidence under the law to proceed to trial.

Trial Court Opinion, 11/1/13, at 1-3.

This timely appeal followed, in which Sprague raises the following issues for our review:

1. Should summary judgment be denied in the face of disputed issue of material fact regarding the falsity of defendants' defamatory statements and, if not, is there sufficient evidence to create an issue of fact as to whether defendants' defamatory statements regarding the plaintiff were false?

2. Should summary judgment be denied where the defendants' state of mind is in dispute and there is ample evidence to support a finding defendants published their defamatory falsehoods with a reckless disregard for the truth?

3. Is a jury permitted to award damages to a libel plaintiff for loss of reputation and emotional anguish based upon evidence of the circulation and content of the defamatory publication and the emotional anguish it caused the plaintiff?

4. Where the newspapers' statements created a false impression of the plaintiff with respect to his public conduct, may a jury consider the plaintiff's claim for false light?

Appellant's Brief at 3.

In **Weaver v. Lancaster Newspapers, Inc.**, 926 A.2d 899 (Pa. 2007), our Supreme Court explained the law regarding public figure defamation:[1]

In Pennsylvania, the Uniform Single Publication Act, 42 Pa.C.S. §§ 8341-8345, sets forth the elements of a *prima facie* case in a defamation action. The burden is on the plaintiff to prove:

(1)  The defamatory character of the communication.

---

[1] Sprague admitted that for purposes of this litigation he is a public figure **See** Plaintiff's Answer in Opposition to Defendants' Motion for Summary Judgment, ¶ 18.

(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

42 Pa.C.S. § 8343(a). In turn, when a *prima facie* case of defamation is properly raised, the defendant may rebut by proving:

(1) The truth of the defamatory communication.
(2) The privileged character of the occasion on which it was published.
(3) The character of the subject matter of defamatory comment as of public concern.

*Id.* at § 8343(b). Case law further informs us that it if the plaintiff is a public figure he or she must prove that the defendant published the offending statement with "actual malice," i.e., with knowledge that the statement was false or with reckless disregard to its falsity. **Curran v. Philadelphia Newspapers**, 439 A.2d 652, 659 (Pa. 1981) (quoting **New York Times Co. v. Sullivan**, 376 U.S. 254, 279-80 (1964).

**Weaver**, **supra** at 903.

A court may enter summary judgment when "a non-moving party has not produced 'sufficient evidence' on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor." **Ertel v. Patriot News Co.**, 674 A.2d 1038, 1042 (Pa. 1996). Here, the trial court properly concluded that Sprague failed to establish: (1) the allegedly defamatory statements were not opinion; (2) the statements were false; by clear and convincing evidence; (3) the article was published with malice; and (4) entitlement to damages. Failure to establish any one of

these elements would have been fatal to Sprague's claim. ***See*** Trial Court Opinion, 11/1/13, at 16.

After careful review of the parties' briefs, the record and the relevant law, we agree with Judge Rau's analysis and affirm on the basis of her well-reasoned opinion. We instruct the parties to attach a copy of Judge Rau's decision in the event of further proceedings.

Order affirmed.


PANELLA, J., files a Dissenting Memorandum.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/26/2014

RICHARD A. SPRAGUE, ESQUIRE,      :

         Plaintiff,             :      JANUARY TERM, 2010
                                 :      NO. 02930

     v.                             :

JILL PORTER; PHILADELPHIA MEDIA      :      1649 EDA 2013
HOLDINGS, LLC; PHILLY ONLINE, LLC;      :
PHILADELPHIA NEWSPAPERS, LLC; and      :
PMH ACQUISITION, LLC,                 :

         Defendants.             :

RAU, J.

## OPINION

"As long as the reason of man continues fallible,
and he is at liberty to exercise it, different opinions will be formed."
—James Madison[1]

### I.     STATEMENT OF THE CASE

Philadelphia attorney Richard A. Sprague (Appellant) represented his friend

State Senator Vincent Fumo during a federal investigation and prosecution for

public corruption and obstruction of justice. Senator Fumo was charged, among

other things, with deleting emails and wiping computer hard drives during the

federal investigation. On February 8, 2007, Mr. Sprague called a press conference

and stated that his client had "sought advice from a lawyer—not me—on whether to

change his policy" before deleting emails during the federal investigation.

Sometime later, Mr. Sprague's personal and professional relationship with Senator

---

[1] THE FEDERALIST NO. 10 (James Madison)

Sprague Vs Porter Etal-OPFLD



10010293000107

Fumo changed and they parted ways. In February 2009, Mr. Sprague was called by the prosecution at Senator Fumo's criminal trial. Mr. Sprague testified that notwithstanding what he said at the press conference two years earlier, he had never believed Senator Fumo's claim of having relied upon legal advice when he purged emails: "Did I believe it? Of course not."

Philadelphia Daily News reporter Jill Porter had been covering the public corruption trial in her weekly column from the beginning. She attended the earlier press conference and the trial. Two days after Mr. Sprague's trial testimony, Ms. Porter wrote, "Sprague, once Fumo's beloved mentor and best friend, labeled Fumo a liar when he testified at Fumo's trial this week. But he acknowledged that he was something of a liar, too." Ms. Porter quoted Mr. Sprague's statements two years earlier at the press conference when he said Senator Fumo had relied upon a lawyer's advice in deleting the emails. She then quoted his recent trial testimony when he admitted that he had never believed the story he told about Senator Fumo's defense at the press conference. Ms. Porter posed questions in her column about Mr. Sprague's conduct:

> "So one of the most powerful attorneys in Philadelphia believes that it's acceptable to deliberately mislead the public on behalf of a client?
>
> That it's appropriate to vigorously perpetrate an untruth, as part of his legal obligation?"

See Ct. Ex. A, Jill Porter, The law, duty, and truth, PHILA. DAILY NEWS, Feb. 20, 2009, at 6, 12, attached; Defs.' Mot. Summ. J. Ex. 4. Ms. Porter answered the questions by writing that "Sprague's posturing on Fumo's behalf may not be officially unethical" but "it sure *seems underhanded and immoral to me.*" See id. (emphasis provided).

2

In response, Mr. Sprague filed suit for defamation and false-light invasion of privacy against Ms. Porter and the Daily News' entities (Appellees) that published the column on January 26, 2010. After discovery was complete, the Appellees moved for summary judgment and argued that Mr. Sprague failed to produce the legally required evidence that the published statements were false or not opinion, that they were made with malice, and that he suffered any damages. On May 17, 2013, this Court granted summary judgment on all four grounds because there was not sufficient evidence under the law for the claim to proceed to trial. This appeal followed.

II. UNDISPUTED FACTS

Mr. Sprague represented his longtime friend[2] State Senator Vincent Fumo during a federal investigation and after he was indicted on federal corruption charges. In January 2004, Mr. Sprague met with prosecutors at the U.S. Attorneys' Office and learned that there was a grand jury investigation of Senator Fumo and a nonprofit organization to which he was connected, Citizens Alliance for Better Neighborhoods. (Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. Ex. I, Sprague Dep. 244:12–13, Oct. 10, 2012.) On February 6, 2007, Senator Fumo was indicted with, among other things, obstruction of justice and conspiracy to obstruct justice for allegedly conspiring with his staff to delete emails and destroy electronic evidence after he learned of the federal investigation in January 25, 2004, and before he

---

[2]Mr. Sprague described his relationship with Mr. Fumo as follows:

"I would say that we became very, very close friends. I believe we had a father/son relationship. It was a—not only a close friendship, I looked upon him as a son. I believe he looked upon me as a father figure. And we traveled together, we did many things together, we worked together. It was as close a relationship, I believe, as you could have."

(Defs.' Mot. Summ. J. Ex. 1, United States v. Fumo Trial Tr. vol. 8, 84:23–85:3, Feb. 18, 2009).

3

received a subpoena in February 2005. (Defs.' Mot. Summ. J. Ex. 12 & Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. Ex. F, U.S. Dep't of Justice press release relating to indictment; See also Superseding Indictment at 193–262, United States v. Fumo, 2009 WL 1688482 (E.D. Pa. 2009) (Criminal Action No. 06-319); Defs.' Mot. Summ. J. Ex. 8, United States v. Fumo, Gov. Ex. 1476, & Ex. 9, United States v. Fumo Gov. Ex. 1545, emails from Sen. Fumo staffer Leonard P. Luchko).

During his deposition, Mr. Sprague testified that he had never believed Senator Fumo's defense relating to deleting the emails[3]:

Q. And you didn't believe it, I mean, right from the beginning because of the way the story evolved; correct?
A. Well, you have to understand, I personally did not believe it, because of the circumstance of Fumo picking up the phone and calling somebody, exiting the office for a very short period of time, coming back and making the statement that I have said . . . .
Q. Right. So the way this all happened did not make it seem very credible to you; correct?
A. That's correct. . . . But the circumstances and the way it happened led me to doubt its accuracy and truthfulness . . . .

(Defs.' Mot. Summ. J. Ex. 5, Sprague Dep. 87:8–19; 88:3–7; 88:17–19, Dec. 10, 2012.) Mr. Sprague admitted that he "did not personally believe Mr. Scandone [a lawyer] had advised Senator Fumo that it was permissible under federal law not to retain any document that was not under subpoena." (Compl. ¶ 24.)

---

[3]The relevant issue in this defamation case is whether Ms. Porter defamed Mr. Sprague when she said he "made statements to the public and to a congressional committee that he didn't believe were true." (See Defs.' Mot. Summ. J. Ex. 4, Ms. Porter's article, Feb. 20, 2009.). The issue is not the truth of Senator Fumo's defense and the surrounding circumstances. That dispute was a central focus at Senator Fumo's federal criminal trial where he was convicted on March 17, 2009, for obstruction of justice and conspiracy to obstruct justice related to deleting emails. (Defs.' Mot. Summ. J. Ex. 5, Sprague Dep. 211:9–24, Dec. 10, 2012; see also Judgment in Accordance with the Verdict of the Jury, United States v. Fumo, 2009 WL 1688482 (E.D. Pa. 2009) (Criminal Action No. 06-319).) That dispute is irrelevant to this case. This case focuses on whether Ms. Porter defamed Mr. Sprague when she said he made public statements he didn't believe were true.

4

Nevertheless, on February 8, 2007, two days after Senator Fumo was indicted, Mr. Sprague called a press conference. He began by explaining why he called the press conference:

> ". . . I am a firm believer, professionally, that a lawyer representing a client speaks in court. I do not give press conferences. It is a very rare event. . . . I believe a lawyer, his duty is to say what he has to say and to present it in a courtroom. . . . So why do I do it today? I'm doing it because for a great number of years now, while I have represented Vince Fumo, I have observed what I call malicious leaks by the prosecutor's office to the press.
>
> . . .
>
> It reached its climax with the indictment and the press conference that we observed and you attended by the U.S. Attorney.
>
> . . .
>
> I am here because I firmly believe in fairness. I believe in fairness for any individual, whether in civil matters or criminal matters, that is brought into court.
> And I feel very strongly that what has occurred has been an effort by this prosecutor's office to issue an indictment that I suggest to you is full of twists, distortions, venal and salacious entries, deliberately taking statements that the government knows they have taken out of context, all for the purpose of having an effective public relations campaign by the prosecutor's office, not for the trial of the case in court, but because they feel that they want to win their case in the court of public opinion before the senator ever gets his day in court. And that is why I am here to respond."

(See Defs.' Mot. Summ. J. Ex. 2, Sprague Press Conf. Tr. 2:10–17, 3:4–9, 3:15–4:11, Feb. 8, 2007.) Mr. Sprague addressed the charges of deleting emails during the federal investigation:

> "[W]hen Citizens' was, in the papers, under investigation, Senator Fumo went and sought advice from a lawyer, not me, but a lawyer, whether he had to change his policy.
> And this has been told to the government. And that lawyer told Senator Fumo, no, you don't have to change your policy since you haven't been subpoenaed."

(Id. at 26:11–18.) Mr. Sprague described the indictment as a "fraud." (Id. at 27:18–24.) Mr. Sprague asserted that "this government, and Mr. Meehan knows"

5

that when Senator Fumo deleted the emails he had received advice from a lawyer who had been relying on the Arthur Andersen case in telling Senator Fumo he did not have to change his email retention policy. (Id. at 26:10–11.) Mr. Sprague did not say at the press conference that he did not believe the statements he made nor did he qualify the statements as having been what Senator Fumo told him was his defense. Mr. Sprague did not mention that the Arthur Andersen[4] case was decided after the purported legal advice and the email deletion. Mr. Sprague's statements to the press were presented as facts.

Later in November 2007, Mr. Sprague's law firm submitted a memorandum, approved by Mr. Sprague, to a Congressional subcommittee. (Defs.' Mot. Summ. J. Ex. 5, Sprague Dep. 374:8, Dec. 10, 2012). The memorandum argued that the federal prosecution of Senator Fumo was improperly politically motivated. (See Defs.' Mot. Summ. J. Ex. 3 & Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. Ex. H, Sprague & Sprague Mem. to House Subcommittee on Commercial and Administrative Law, Nov. 21, 2007; see also Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. ¶ 62.) A footnote of that memorandum stated,

> "The last broad category of charges relates to allegations of conspiracy to obstruct justice. In this regard, Senator Fumo is alleged to have conspired to obstruct the investigation. In pursuing these charges, the government intentionally ignored documentary evidence of a long standing document retention policy (that the

---

[4]On January 25, 2004, the Philadelphia Inquirer published a story about the FBI's investigation of a deal involving Sen. Fumo, Verizon Communications, and Citizens Alliance for Better Neighborhoods (Pl.'s Answer to Defs.' Mot. Summ. J. ¶¶ 22 & 23 & Ex. O), soon after which Sen. Fumo's office began deleting emails (id. at ¶ 26; Defs.' Mot. Summ. J. Exs. 8 & 9, emails from Sen. Fumo staffer Leonard P. Luchko); Mr. Sprague accepted service of a search warrant on Sen. Fumo's State Senate Office on February 28, 2005 (Pl.'s Answer to Defs.' Mot. Summ. J. ¶ 26). Arthur Andersen was not decided until May 31, 2005, after these events. (Arthur Andersen LLP v. United States, 544 U.S. 696 (2005). See also Defs.' Mot. Summ. J. Ex. 5, Sprague Dep. 301:19–302:20, Dec. 10, 2012)

6

investigation) [sic] and was followed until a search warrant was served in the Senator's office. The government also ignored uncontroverted evidence of the Senator's reliance upon (albeit erroneous) legal advice for much of the relevant period."

(Defs.' Mot. Summ. J. Ex. 3 & Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. Ex. H, Mem. at 10, n.12.)

Mr. Sprague and Senator Fumo's relationship subsequently deteriorated. Senator Fumo hired new counsel. (See Defs.' Mot. Summ. J. & Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. ¶ 65.) Senator Fumo then claimed that he had relied on Mr. Sprague and other Sprague firm attorneys who advised him that it was permissible to destroy documents that were not under subpoena notwithstanding the existence of a federal investigation.[5] (Compl. ¶ 17; see also Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. Ex. J, United States v. Fumo Trial Tr. vol. 7 13:17–14:4, Feb. 11, 2009.)

During Senator Fumo's trial in February 2009, the prosecution called Mr. Sprague as a witness. (See Defs.' Mot. Summ. J. & Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. ¶ 71.) Senator Fumo's defense lawyer cross-examined Mr. Sprague

---

[5]Mr. Sprague claimed that he never advised Senator Fumo that it was permissible to delete emails:

    Q. Did Senator Fumo ever ask you whether his defense should be that you gave him the advice?

    A. I believe that at the meeting in my office on that Friday, before Fumo made that call, he asked whether it was possible that he could say that he got that advice from me. One, it was pointed out that he didn't get that advice from me. But, secondly, even if it was so and I was to become a witness, that would disqualify me from representing him. I believe that occurred.

    Q. Okay And what was his reaction to the two things that were pointed out to him?

    A. That led to his saying, what if I had an attorney who gave me that advice?

(Defs.' Mot. Summ. J. Ex. 5, Sprague Dep. 110:1–20, Dec. 10, 2012.).
Again, the dispute between Senator Fumo and Mr. Sprague is irrelevant to this defamation action. This action instead focuses on the truth of whether Mr. Sprague "made statements to the public and to a congressional committee that he didn't believe were true." (See Defs.' Mot. Summ. J. Ex. 4, Ms. Porter's article, Feb. 20, 2009.)

about whether he believed what he said at the press conference and to the Congressional Subcommittee:

> Q. Now, after the indictment in February of 2007, do you remember holding a press conference talking about this case?
> A. Yes, I do.
> Q. Dealing with some of the same issues that you dealt with when you later wrote to Congress; is that right?
> A. That's correct.
> Q. And do you remember again before the media saying, "Here the government is taking a position that once Fumo knew that CABN had been subpoenaed (even though Fumo wasn't), he should've changed his policies, notwithstanding the government knows that when CABN was under investigation, Senator Fumo went and sought advice from a lawyer, not me, but a lawyer, whether he had to change his policy." That's what you said to the media; is that right?
> A. Absolutely. I said that to the media. I said it to the committee in Congress, and I referred and sent it to the government here. My belief had nothing to do with it. . . . [M]y duty, in terms of my client, was to convey what my client was saying. Whether I believed him or not was not the issue.
>
>         . . .
> Q. And when you said to the Committee, that . . . it was uncontroverted, you didn't believe it; is that right?
> A. It was uncontroverted. There was no one else to dispute it. Did I believe it? Of course not.

(See Defs.' Mot. Summ. J. Ex. 1, United States v. Fumo Trial Tr. vol. 8, 162:11–163:2, 163:5–7, 164:4–8, Feb. 18, 2009.) When Mr. Sprague was asked whether his "concept of proper advocacy includes lying to the press," he answered:

> "I wouldn't put it that broadly, but I would put it that speaking up for your client to the press is part of it, and I guess I took a little bit of license saying it was from me, because I wanted the press to feel that it wasn't my client who was pushing me. I was doing it on behalf of my client."

(Id. at 204:12–18.)

A few days after Mr. Sprague's trial testimony, Ms. Porter wrote in her weekly column about Mr. Sprague's statements to the public and the letter to the

8

Congressional Committee, his trial testimony, and his approach to client advocacy.

The entire article read:

**The law, duty & truth**
**JILL PORTER**

LAWYER RICHARD Sprague may have reveled in plunging the blade into his now-enemy Vince Fumo this week.

But he didn't do himself any favors.

Sprague, once Fumo's beloved mentor and best friend, labeled Fumo a liar when he testified at Fumo's trial this week.

But he acknowledged that he was something of a liar, too.

Sprague admitted that after Fumo was indicted in 2007, he made statements to the public and to a congressional committee that he didn't believe were true.

"My duty in terms of my client was to convey what my client was saying," he testified this week.

"Whether I believed him or not was not the issue."

So one of the most powerful attorneys in Philadelphia believes that it's acceptable to deliberately mislead the public on behalf of a client?

That it's appropriate to vigorously perpetrate an untruth, as part of his legal obligation?

That's sure to enhance the credibility of lawyers—such as it is.

Sprague's posturing on Fumo's behalf may not be officially unethical under the code of legal conduct, which specifically prohibits misleading a court but not the public.

But it sure seems underhanded and immoral to me.

---

Fumo is charged with, among other things, obstruction of justice for deleting e-mails pertinent to a federal corruption investigation that he knew was under way.

Fumo claims that Sprague and another attorney told him that it was legal to purge the information, despite the investigation, because he hadn't personally been subpoenaed.

Sprague testified on Wednesday that he had told Fumo no such thing.

But he acknowledged having written a letter to a congressional investigating committee that there was "uncontroverted evidence" that another lawyer had given Fumo such advice.

And he insisted the same thing at a 2007 news conference he called on Fumo's behalf, which I attended.

9

"Senator Fumo went and sought advice from a lawyer—not me—on whether to change his policy" of routinely deleting e-mails, Sprague said at the news conference.

"That lawyer told Senator Fumo, 'No, you don't have to change your policy because you haven't been subpoenaed.'"

In court this week, Sprague contemptuously dismissed the idea that Fumo had been given such legal advice.

"Did I believe it?" he said in response to a question from Fumo's attorney, Dennis Cogan.

"Of course not."

Cogan chided him for not acknowledging that he didn't believe Fumo.

"Mister Cogan," Sprague said indignantly, "are you suggesting to this jury that I speak up for my client and at the same time tell the public that I don't believe my client? No lawyer would do that, and you know it."

But not every lawyer—or so you'd hope—would deliberately sell the public a bill of goods.

---

Lawyers are clearly prohibited from lying in court and in sworn testimony before, say, a legislature.

But lying in public "is not so clear," said Robert Tuttle, a professor of law at George Washington University School of Law.

Still, it's not considered "honorable" behavior, said Tuttle, an expert on legal ethics.

"And," he said, "here's the important point: It's not something that lawyers are expected to do in defense of your client."

Lawyers have no obligation to violate "ordinary moral standards on behalf of a client," Tuttle said.

When faced with an "awkward question," he said, "there's a big difference between deferring and deflecting a question and affirmatively lying.

"Even if it's not illegal, it suggests something about overstepping this role from somebody offering a lawful service to somebody who feels that their job is to protect this person at all costs."

So while Sprague may feel triumphant this week about being able to inflict damage on Fumo, he didn't do himself any favors, either. ✦

---

Email porter@phillynews.com or call 215-854-5850. For recent columns: http://go.philly.com/porter

✦ ✦ ✦

10

Ct. Ex. A. (See also Defs.' Mot. Summ. J. Ex. 4, Porter's article, Feb. 20, 2009;

Defs.' Mot. Summ. J. & Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. ¶ 79.)

Mr. Sprague admitted that he was a public figure. (Pl.'s Answer in Opp'n to

Defs.' Mot. Summ. J. ¶ 18). No evidence was produced that the quotes in the

article were not accurate. No evidence was proffered that additional quotes were

necessary to provide context. No evidence was shown that Ms. Porter wrote

anything in the article that she knew or strongly suspected as being false. No

evidence was presented that anything in the article was false.

No evidence was presented as to any disagreements, acrimony, comments,

or tension between Mr. Sprague and either Ms. Porter or owners of the Daily News.

Mr. Sprague testified that he does not know Ms. Porter, personally or professionally,

at all: "I may be in error, but, to the best of my recollection, the first contact I ever

had of Jill Porter was when Mr. Beasley was taking her deposition in this case. . . .

And if she had lunch with me, as I say, that went over my head. . . . [I]f she walked

in here right now, I would not recognize her. I could not pick her out." (Defs.' Mot.

Summ. J. Ex. 7, Sprague Dep. 127:19–24; 128:5–6; 128:23–129:1, Oct. 10, 2012.)

Ms. Porter testified at deposition, "I had great respect for Mr. Sprague as an

attorney," "I don't dislike Mr. Sprague" and "I really have no personal feelings about

Mr. Sprague." (Defs.' Mot. Summ. J. Ex. 15, Porter Dep. 213:6–7, 167:9, 181:6–7,

Feb. 8, 2012.)

Mr. Sprague testified that he was good friends with Brian P. Tierney, the

head of the ownership group that controlled the Daily News at the time the column

was published. Mr. Sprague occasionally visited Mr. Tierney at his offices and had

lunch with him. (Defs.' Mot. Summ. J. Ex. 7, Sprague Dep. 68:7–69:20, Oct. 10,

11

2012.) No evidence was presented of an effort by any defendant to knowingly present false information.

On the issue of reputational damage or other damage to his business, Mr. Sprague testified that though he was "shocked" and "furious" about the article (Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. Ex. I, Sprague Dep. 159:20, 160:18–19, Oct. 10, 2012), he experienced no decline in work. Mr. Sprague has expressly admitted that he is "not seeking damages for harm to his law practice or business interests." (Defs.' Mot. Summ. J. Ex. 28, Pl.'s Supplemental Objections & Resps. to Defs.' 1st Set of Interrogs., Nos. 4 & 25, May 12, 2012; Ex. 32, Pl.'s Resp. to Req. for Admis. & Accompanying Interrogs. & Doc. Reqs., No. 1.) He claims that he continues to be inundated with work opportunities and consequently can be very discriminating in the work he accepts. (Defs.' Mot. Summ. J. Ex. 5, Sprague Dep. 457:1–3, Dec. 10, 2012, citing Defs.' Mot. Summ. J. Ex. 33, Fredda Sacharow, Power Personified, PENN L.J., Spring 2009, at 2.) Mr. Sprague also conceded that Ms. Porter's column did not negatively affect his personal or family activities or relationships. (Defs.' Mot. Summ. J. Ex. 32, Pl.'s Resp. to Defs.' Reqs. for Admis. & Accompanying Interrogs. & Doc. Reqs. Nos. 3 & 4.) Mr. Sprague offered his friend, Lynne M. Abraham, as a witness on damages but she testified that the only way Mr. Sprague's reputation has "changed notably" since the publication of Ms. Porter's column is that it has "become greater." (Defs.' Mot. Summ. J. Ex. 21, Abraham Dep. 54:12–15, Jan. 16, 2013.) No evidence was presented of actual damage to Mr. Sprague's reputation including anyone who thought less of him as a result of the article.

12

## III.   LEGAL ANALYSIS AND CONCLUSIONS

The First Amendment guarantees of free speech and press form the necessary backdrop upon which every state law defamation claim must be examined. Federal constitutional protections of speech and press impose limits on state tort law protections to reputation in defamation claims. To ensure freedom of speech and press, courts must carefully scrutinize defamation claims particularly in cases involving public figures or issues. The First Amendment requires that summary judgment is "essential" in such cases where minimum legal requirements have not been met. First Lehigh Bank v. Cowen, 700 A.2d 498, 502 (Pa. Super. Ct. 1997). Otherwise, if people are not protected from the expense and "harassment" of fighting lawsuits without legally sufficient evidence, people will "self-censor" and "free debate" will be compromised. Id. See also New York Times, Co. v. Sullivan, 376 U.S. 254, 270 (1964) (noting that litigation costs alone can chill protected speech). If the press is constrained to the point of timidity out of fear of constant litigation, and if courts fail to step in when the claims obviously lack a basis, then society and democracy suffer greatly. The First Amendment requires that a public figure litigant demonstrate by clear and convincing evidence that an allegedly defamatory statement is false, or not opinion, and that it was made with actual malice. The litigant must also show that damages were sustained

Mr. Sprague claimed that he was defamed by the Daily News article, that it was published with malice, and that he suffered damages. The focus of Mr. Sprague's claim was that the article:

> "falsely and maliciously accused Mr. Sprague of 'affirmatively lying,' falsely asserted that Sprague admitted to being 'a liar' and wrongly impugned Sprague's 'legal ethics,' 'honor,' and moral standards."

13

(Compl. ¶ 42).

Pennsylvania tort law defines libel as "a maliciously written or printed publication which tends to blacken a person's reputation or expose him to public hatred, contempt or ridicule, or injure him in his business or profession." Brophy v. Phila. Newspapers Inc., 422 A.2d 625, 628 (Pa. Super. Ct. 1980) (internal quotation omitted). An action in defamation "is based on a violation of the fundamental right of an individual to enjoy a reputation unimpaired by false and defamatory attacks." Berg v. Consol. Freightways, Inc., 421 A.2d 831, 833 (Pa. Super. Ct. 1980).

In addition to demonstrating that the allegedly defamatory statements are not protected by the First Amendment, in Pennsylvania a person bringing a defamation claim bears the burden of proving:

"(1) The defamatory character of the communication.
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion."

Weaver v. Lancaster Newspapers, Inc., 926 A.2d 899, 903 (Pa. 2007) (citing 42 Pa. Cons. Stat. Ann. § 8343(a)).

Statements of opinion based on disclosed facts are not defamation. Baker v. Lafayette College, 532 A.2d 399, 402 (Pa. 1987). There is no defamation if the communication is true. Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767, 775 (1985); Spain v. Vicente. 461 A.2d 833, 836 (Pa. Super. Ct. 1983). In the case of a public figure or public issue, the communication must be shown by clear and

convincing evidence to be substantially false and made with actual malice. Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974).

After discovery was completed, the Daily News and Ms. Porter argued that summary judgment was mandated under Pennsylvania Rule of Civil Procedure 1035.2(2)[6] because:

> (1) Mr. Sprague did not show clear and convincing evidence that any statement in the column was materially false, as the First Amendment requires of a defamation claim;
>
> (2) The publication was an opinion based on disclosed facts, which does not constitute defamation;
>
> (3) Mr. Sprague, a public figure, failed to provide clear and convincing evidence that Ms. Porter acted with actual malice; and
>
> (4) Mr. Sprague did not show evidence that he suffered recoverable damages.

To survive summary judgment, Mr. Sprague had the burden of producing "sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor." Ertel v. Patriot-News Co., 674 A.2d 1038, 1041–42 (Pa. 1996) (affirming trial court grant of summary judgment where plaintiff presented no evidence that statement published was false). Allegations are insufficient at this stage; actual evidence must be produced. ToDay's Hous. v. Times Shamrock Commc'ns, Inc., 21 A.3d 1209, 1213 (Pa. Super. Ct. 2011) (quoting Shepard v. Temple Univ., 948 A.2d 852, 856 (Pa.

---

[6]Pennsylvania Rule of Civil Procedure 1035.2(2) provides for summary judgment if after discovery has been completed.
> "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury."

15

Super. Ct. 2008) (citations omitted)). Mr. Sprague *asserted* many things but failed to offer *evidence* sufficient for this action to survive a motion for summary judgment.

It is this Court's duty to determine whether, viewing the evidence in the light most favorable to Mr. Sprague, he "failed to produce evidence of facts essential to the cause of action." Ertel, 674 A.2d at 1042 n.3 (Pa. 1996); see also Hepps v. Phila. Newspapers, Inc., 485 A.2d 374 (Pa. 1984) (while existence or absence of actual malice is question of fact for jury in libel action, whether there is sufficient evidence to warrant such finding by jury is question of law for court). Mr. Sprague failed to show that the allegedly defamatory statements were not opinion, nor did he show clear and convincing evidence that they were false and that the article was published with malice. Mr. Sprague also did not show any evidence entitling him to damages. The absence of sufficient evidence of any one of these four essential elements is fatal to his claims. Here, there was insufficient evidence of all four. Since Mr. Sprague did not provide the required evidence, the law required that this Court grant summary judgment.

A.    Pennsylvanians played a major role in modern jurisprudence of speech, press and defamation.

Pennsylvania has deep roots, having played a critical role, in our nation's laws governing free speech and press and their interplay with defamation. Pennsylvanians set the tone in terms of both the architecture of constitutional protections and their ensuing interpretation.

1.    Andrew Hamilton

The principles underlying contemporary defamation law as it is limited by First Amendment protections were first enunciated by Andrew Hamilton, the well-

16

known Philadelphia lawyer who inspired the term "Philadelphia lawyer."[7] In 1735, Andrew Hamilton travelled from Philadelphia to New York to represent a publisher who had been jailed and charged with libel for publishing essays, letters, and cartoons critical of the governor in the landmark case of The Crown v. John Peter Zenger.[8] Libel law at that time forbade direct criticism of the executive even if the criticisms were true. Mr. Hamilton argued that since "falsehood makes the scandal," truth should be a complete defense to libel:

> "I beg leave to insist that the right of complaining or remonstrating is natural; and the restraint upon this natural right is the law only, and those restraints can only extend to what is *false*: For as it is truth alone which can excuse or justify any man for complaining of a bad administration . . . . *Truth* ought to govern the whole affair of libels."

Trial of Zenger at 32, 84 (emphasis in original). He argued that the party alleging the libel should have the burden to demonstrate falsehood before the case could be actionable. Id. at 84. Mr. Hamilton emphasized the importance of citizens' freedom to voice their opinions and complaints especially about those in power and sought to "quench the flame . . . of the government to deprive a people of the right of remonstrating (and complaining too) of the arbitrary attempts of men in power." Id. at 99. The jury acquitted the publisher so there was no appeal. Consequently, Mr.

---

[7]Andrew Hamilton's extraordinary legal abilities made "Philadelphia lawyer" a "byword for a lawyer of exceptional prominence and ability." Robert R. Bell, Philadelphia Lawyer A History 1735–1945, 36 (1992) (hereinafter Philadelphia Lawyer). Mr. Hamilton left a number of other indelible marks on the City of Philadelphia. He was one of the earliest members of the Philadelphia Bar. Notably, Mr. Hamilton also helped plan Pennsylvania's historic Independence Hall. See Andrew Hamilton, http://www.britannica.com/EBchecked/topic/253392/Andrew-Hamilton (last visited Jun. 4, 2013).
[8]Mr Hamilton's argument in Zenger's trial in 1735 has been referred to as "the game of American Freedom, the morning star of that liberty which subsequently revolutionized America." Philadelphia Lawyer 27, 31, & 35; Burton Alva Konkle, The Life of Andrew Hamilton 1676–1741: The Day-Star of the American Revolution, 2, 70 (1941); James Alexander, A Brief Narrative of the Case and Trial of John Peter Zenger: Printer of the Weekly Journal, (Stanley Katz ed., The Belknap Press of Harvard University Press 1963) 70 (hereinafter Trial of Zenger).

Hamilton's vision of what should be required to prove defamation without unduly limiting the "liberty" of speech was not enunciated in written precedent. Id.

### 2. The Pennsylvania Constitution of 1776

In 1776, several months after the Declaration of Independence was signed in Philadelphia, Pennsylvanians drafted a constitution which was the first state constitution to provide for free speech and press:

> "[T]he people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained."[9]

The Pennsylvania Constitution of 1776 then served as a template for the United States Constitution, which incorporated free speech and press provisions into its First Amendment enacted over a decade later, in 1791. John L. Gedid, History of the Pennsylvania Constitution, in THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES 44, 45, 50 (Ken Gormley, et al., eds., 2004).

Pennsylvania's inaugural constitutional guarantees of freedom of speech and press have only grown more robust with time, with the current provision holding:

> Freedom of Press and Speech; Libels.
> The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof.
>
> The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.
>
> No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public

---

[9] Seth F. Kreimer, Protection of Free Expression: Article I, Sections 7 and 20, in THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES 251 N.3 (Ken Gormley, et al., eds., 2004). See also John L. Gedid, History of the Pennsylvania Constitution, in id. at 45.

18

capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

PA. CONST. of 1968, § 7 (emphasis provided).

B.      For public figures or matters of public concern, the First Amendment requires that a plaintiff bringing a defamation claim meet a higher evidentiary burden to survive summary judgment.

The United States Constitution echoed the protections of "expression" through speech and press that Pennsylvania's Constitution guaranteed, but in a more prime location, the First Amendment:

> **Freedom of religion, press and expression:** Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or **abridging the freedom of speech, or of the press**; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST. amend. I (emphasis provided). Though the First Amendment protected freedom of the press from 1791 on, Mr. Hamilton's 1735 argument to the jury about balancing the protections of an individual's reputation with those of a free press waited over two centuries before it was fully adopted by the United States Supreme Court. In N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279–81 (1964), the United States Supreme Court held that, to avoid a chilling effect on important public speech, the First Amendment requires a higher standard of proof when it comes to defamation claims brought by public officials. In Sullivan, the Supreme Court held that a public official who brings a defamation action must prove by clear and convincing evidence that the statement is false and that the defendant made the statement with "actual malice." Id. See also Phila. Newspapers, Inc. v. Hepps, 475

U.S. 767, 775 (1985) ("[A]s one might expect given the language of the Court in New York Times, a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation.") (internal citations omitted).

The Supreme Court has explained that the First Amendment strictly protects free speech and press from being stifled, even at the risk that some publications may be inaccurate:

> "[T]he stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. . . . [T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as the true ones."

St. Amant v. Thompson, 390 U.S. 727, 731–32 (1968). The Supreme Court warned that "erroneous statement is inevitable in free debate," and "it must be protected if the freedoms of expression are to have the breathing space that they need to survive." Sullivan, 376 U.S. at 271–72 (internal citations and quotations omitted). Publications are not required to be flattering or approved by the person to whom they refer. Such censorship would deaden the public's interest and obstruct active, intelligent involvement in public issues and government. Honest efforts to inform the public are constitutionally protected whereas maliciously and recklessly publicized lies about public figures or topics are not. Id.

In first articulating the actual-malice standard in Sullivan, the Supreme Court outlined the significance of free speech and press to the fabric of our nation and culture.

> "It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions, and this opportunity is to be afforded for vigorous advocacy no less than

20

abstract discussion. The First Amendment, said Judge Learned Hand, 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.'"

376 U.S. at 269–70 (internal quotes and citations omitted). "Actual malice" is shown if the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." Sullivan, 376 U.S. at 279–80. The actual-malice standard reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." Id. at 270.

The Supreme Court later extended the actual-malice standard to "public figure" plaintiffs who are not government officials. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 336–37 (1974) (quoting Curtis Publ'g Co. v. Butts, 388 U.S. 130, 164 (1967) (Warren, C.J., concurring)); Tucker v. Phila. Daily News, 848 A.2d 113, 130 (Pa. 2004). In Gertz, the Supreme Court explained why public figures should be held to the same standard as public officials:

> "More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. . . . Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own . . . . More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."

418 U.S. at 344–45. Thus, a private citizen who gets involved in public

21

controversies assumes the risk of that involvement, and must prove actual malice and falsity by clear and convincing evidence.

The United States Supreme Court also has held that speech on matters of public concern "is at the heart of the First Amendment's protection" and that such speech is, accordingly, entitled to special protection. First Nat'l Bank v. Bellotti, 435 U.S. 765, 776 (1978). The Supreme Court has described the importance of the role of the press in matters of public concern:

> "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment."

Thornhill v. Alabama, 310 U.S. 88, 101–02 (1940). Consequently, the same higher evidentiary standards apply to defamation claims against those who are addressing issues of public concern: litigants must demonstrate clear and convincing evidence that the statements were false and were made knowing it was false or with reckless disregard for the truth (actual malice). Gertz, 418 U.S. at 335–37 & n.7.

Mr. Sprague has admitted that he is a public figure. (Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. ¶ 18). Additionally, the article was about Mr. Sprague's former representation of a public official, Senator Fumo, during a federal investigation and prosecution for public corruption, is an issue of clear public concern. On every level, Mr. Sprague was required to meet the First Amendment's higher burden of proof to succeed: he needed to prove by clear and convincing evidence that the statements were false and made with actual malice.

22

C. Did Mr. Sprague Produce Clear and Convincing Evidence that the Statements at Issue Are False?

Mr. Sprague's claims are directed at the following passage:

"Sprague, once Fumo's beloved mentor and best friend, labeled Fumo a liar when he testified at Fumo's trial this week. **But he acknowledged that he was something of a liar, too. Sprague admitted that after Fumo was indicted in 2007, he made statements to the public and to a congressional committee that he didn't believe were true.**

. . .

So one of the most powerful attorneys in Philadelphia believes that it's acceptable to deliberately mislead the public on behalf of a client?

That it's appropriate to vigorously perpetrate an untruth, as part of his legal obligation?"

Ct. Ex. A (emphasis provided). Mr. Sprague takes issue with the Ms. Porter's answer to those questions and her questions to a law professor about the ethics and morality of "lawyers" lying in defense of their clients.

The column included statements of fact and opinions. With respect to the statements of fact, Mr. Sprague has the burden of proving by clear and convincing evidence that the offending statement was false to sustain his defamation claim (Compl. ¶¶ 40–48). Hepps v. Phila. Newspapers, Inc., 485 A.2d 374, 389 (Pa. 1984). See also Tucker v. Phila. Daily News, 848 A.2d 113, 127–28 (Pa. 2004); Ertel v. Patriot-News Co., 674 A.2d 1038, 1041 (Pa. 1996); Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 n.6 (1990); Phila. Newspapers. Inc. v. Hepps, 475 U.S. 767, 779. n.4 (1986). A statement that is "*substantially* true" cannot be defamatory. Kilian v. Doubleday & Co., 79 A.2d 657, 660 (Pa. 1951) (emphasis added). "If it cannot be conclusively determined whether the publication was true or false, the plaintiff's claim must fail." ToDay's Hous. v. Times Shamrock Commc'ns. Inc., 21 A.3d 1209, 1213 (Pa. Super. Ct. 2011); see also Milkovich, 497 U.S. at 17.

23

Moreover, "[t]he law does not require perfect truth, so long as any inaccuracies do not render the substance and 'gist' of the statements untrue." Today's Hous., 21 A.3d at 1215. Whether Mr. Sprague has presented sufficient evidence of falsity is a question of law for the court. See Ertel, 674 A.2d at 1042 (defendant newspaper was entitled to summary judgment where public-figure plaintiff produced no evidence that the article at issue was false, an essential element of a plaintiff's claim).

Mr. Sprague did not show any evidence that Ms. Porter wrote anything false. He does not contest the accuracy of her quotations of his statements to the press where he articulates Senator Fumo's defense. Mr. Sprague does not argue that Ms. Porter misquoted his trial testimony where he acknowledges that he never believed Senator Fumo's defense even when he presented the defense at a press conference. Mr. Sprague also does not argue that Ms. Porter failed to disclose other crucial facts.

As Ms. Porter quoted, Mr. Sprague testified that he did not believe his own words at the press conference. Mr. Sprague's statements at the press conference were presented as a factual account of what actually occurred:

> "[W]hen Citizens' was, in the papers, under investigation, Senator Fumo went and sought advice from a lawyer, not me, but a lawyer, whether he had to change his policy . . . . And that lawyer told Senator Fumo, no, you don't have to change your policy since you haven't been subpoenaed."

(See Defs.' Mot. Summ. J. Ex. 2, Sprague Press Conf. Tr. 26:11–18, Feb. 8, 2007.) Mr. Sprague did not qualify his statements at the press conference with "My client tells me" or "It is my client's position." Mr. Sprague never disclosed at the press conference that he did not believe what he was saying: that a lawyer had advised

24

Senator Fumo that he could destroy emails during a pending federal investigation. Mr. Sprague did not say at the press conference what he later testified to under oath, when he was no longer representing Senator Fumo, that he never believed the "accuracy and truthfulness" of Senator Fumo's defense based on "the circumstances and the way it happened."[10] (Defs.' Mot. Summ. J. Ex. 5, Sprague Dep. 88:17–19, Dec. 10, 2012.) Indeed, Mr. Sprague testified that he did not even believe Senator Fumo had received *any* legal advice from Mr. Scandone much less advice on whether he could destroy emails during a federal investigation that involved his conduct. (See Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. Ex. K,

---

[10] Mr. Sprague's version of what took place at meetings with Senator Fumo when they discussed his defense to charges of deleting email and wiping the computer hard drive is as follows:

> ". . . Senator Fumo said, I thought that I would have to be subpoenaed myself to be involved in an obstruction of justice, there'd have to be a subpoena on me, and if there was no subpoena, I could do what I want.
>
> . . .
>
> And Senator Fumo, when he was asked by Sheppard, 'Where'd you get that crazy idea.' said, 'Well, that's what I thought, but it would help me if I had a lawyer who gave me that advice.' And we said, sure, it would help you if you had a lawyer who had given you that advice. That was really that part of that meeting.
>
> . . .
>
> We were having that meeting in my office, and Senator Fumo said again, what if I had a lawyer who gave me that advice that I would have to have been subpoenaed before anything would affect, would that help me, and I said, yes, it would. And he then took out his cell phone and he called somebody, and then he left my office, and I believe he went downstairs. I didn't see him go downstairs, but he came back up very quickly, and said, I have a lawyer who will say he gave me that advice. And I asked, who is that. And he said, it is Robert Scandone.
>
> . . .
>
> What he said was, was that Mr. Scandone will be the lawyer who will testify—will say he gave me that advice, and he's basing it on the Arthur Andersen case.
>
> . . .
>
> Q. Okay. Now, did you raise with him at that time, did it occur to you that the Arthur Andersen case was decided in May of 2005, after all the events of 2004?
> A. I didn't raise a thing. . . ."

(Defs.' Mot. Summ. J. Ex. 1, United States v. Fumo Trial Tr. vol. 8, 137:21–25; 138:12–17; 142:15–24; 144:9–11; 144:14–17. Feb. 18, 2009.) Again, the issue in this defamation case is not what happened that led Senator Fumo and his staff to delete emails, which was central to the federal criminal trial, but rather whether Ms. Porter's statement was substantially true that Mr. Sprague said things "to the public . . . that he didn't believe were true." Ct. Ex. A.

25

<u>United States v. Fumo</u> Trial Tr. vol. 8, 156:25–157:4, Feb. 18, 2009.) At trial, when asked, in the context of whether it was Mr. Fumo's idea to hold the press conference or his own, and whether his concept of proper advocacy included lying to the press, Mr. Sprague said, "[S]peaking up for your client to the press is part of it and *I guess I took a little bit of license saying that it was from me*, because I wanted the press to feel that it wasn't my client who was pushing me, I was doing it on behalf of my client." (<u>See</u> Defs.' Mot. Summ. J. Ex. 1, <u>United States v. Fumo</u> Trial Tr. vol. 8, 204:11–18, Feb. 18, 2009 (emphasis provided)).

Ms. Porter commented that Mr. Sprague "acknowledged that he was something of a liar" when "he made statements to the public and to a congressional committee that he didn't believe were true." Mr. Sprague's testimony at Senator Fumo's trial shows that this is a true characterization of the facts: "Absolutely. I said that to the media. I said it to the committee in Congress, and I referred and sent it to the government here. My belief had nothing to do with it." He continued by saying, "Did I believe it? Of course not." (<u>See</u> Defs.' Mot. Summ. J. Ex. 1, <u>United States v. Fumo</u> Trial Tr. vol. 8, 162:25–163:2, 164:8, Feb. 18, 2009.) Indeed, Mr. Sprague testified about whether he had ever believed that Senator Fumo had received legal advice from Mr. Scandone: "I doubted the truth of it very much from the beginning." (<u>See</u> Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. Ex. K, <u>United States v. Fumo</u> Trial Tr. vol. 8, 157:4, Feb. 18, 2009.) Nevertheless, Mr. Sprague said at the press conference:

> "Senator Fumo went and sought advice from a lawyer, not me, but a lawyer, whether he had to change his policy . . . . And that lawyer told Senator Fumo, no, you don't have to change your policy since you haven't been subpoenaed."

26

(See Defs.' Mot. Summ. J. Ex. 2, Sprague Press Conf. Tr. 26:11–18, Feb. 8, 2007.) Thus, Mr. Sprague admitted that he said things at a public press conference that he did not believe to be true.

In addition to not producing evidence of falsity, Mr. Sprague takes a puzzling stance in arguing that the Appellees knew that criminal defense counsel often say things on behalf of their clients that they do not believe to be true. His counsel argues that Ms. Porter's "branding Mr. Sprague as a self-confessed liar for doing what they knew was the customary advocacy of criminal defense counsel reeks of a deliberate avoidance of the truth." (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. Summ. J. 18.)[11] Mr. Sprague seems to be making a tacit admission to what Ms. Porter said about him: that "he made statements to the public . . . that he didn't believe were true." Ct. Ex. A. Mr. Sprague's counsel argues that lawyers often do this and it is part of "vigorously represent[ing]" a client. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. Summ. J. 25.) But in arguing that lawyers do this all the time as part of zealous advocacy, Mr. Sprague does nothing to disprove Ms. Porter's factual statements in her column: Mr. Sprague said things he didn't believe to be true at a press conference in the interest of his client. Indeed, Mr. Sprague's response is that what he did is frequently done by lawyers in representing their clients. Whether or not it is typical for lawyers to present statements to the public that they do not believe to be true on behalf of their clients—an assertion that is apt to incite heated debate within the legal community—has nothing to do with whether Ms. Porter's

---

[11] The bold assertion about what is "customary advocacy of criminal defense counsel" sidesteps the central issues in this case and is irrelevant. Consequently, the Court need dwell no further on this rather dubious and unsubstantiated assertion. Whether or not some other criminal defense counsel also do what Mr. Sprague did here does nothing to prove that Ms. Porter *incorrectly reported* anything about what Mr. Sprague said or did.

27

reporting that this is what Mr. Sprague did was false. Mr. Sprague's counsel seems to be arguing his opinion in defense of Mr. Sprague's conduct rather than proving by clear and convincing evidence that Ms. Porter reported something untrue about Mr. Sprague's conduct.

There was an absence of the requisite evidence that any portion of what Ms. Porter wrote was false. Mr. Sprague failed to demonstrate evidence that Ms. Porter's statement that he "admitted he was a bit of a liar" is not true. Even a statement that is only *substantially* true is not actionable defamation. Kilian, 79 A.2d at 660. Ms. Porter's statement that Mr. Sprague acknowledged he is something of a liar is an inference compelled by Mr. Sprague's own words. Mr. Sprague admitted that he did not believe what he represented to the public as the truth. It was Mr. Sprague's burden to show by clear and convincing evidence that what Ms. Porter wrote was false. He did not do that. He simply asserted that he did not admit that he was a liar. His trial testimony of "Did I believe it? Of course not." contradicts that assertion. At a minimum, he failed to meet the significant burden of showing clear and convincing evidence of falsity that the First Amendment attaches to allegedly defamatory statements.

D. Did Mr. Sprague Produce Evidence that the Statements at Issue Are Not Opinions Based on Disclosed Facts?

Ms. Porter's weekly column disclosed facts as outlined above, and it also expressed her opinion about those facts. "If there is any rule established by universal assent, it is that words which impute an offence against morality, are not actionable unless the offence be indictable, or induce some legal disability." Harvey v. Boies, 1 Pen. & W. 12, 13 (Pa. 1829). Ms. Porter's column simply commented

28

that in her opinion Mr. Sprague's conduct seemed "underhanded and immoral to me." "Statements which represent differences of opinion or are annoying or embarrassing, are, without more, not libelous." Bogash v. Elkins, 176 A.2d 677, 679 (Pa. 1962).

Mr. Sprague believes that his statements were justified in pursuit of zealous advocacy for his client, while Ms. Porter believes that such false statements are unjustified. This is a difference of opinion, based on disclosed facts, about whether it is morally acceptable for a lawyer to publicly lie on behalf of a client.[12] Ms. Porter fairly characterizes Mr. Sprague's behavior in a certain way that he dislikes. However, personal judgments about whether an act is moral or immoral cannot be proved true or false, and are not defamation.

Ms. Porter's opinion column was focused precisely on her opinion about the propriety or morality of a lawyer who engages in such conduct. She asked the question of whether misleading the public on behalf of a client was right:

> "So one of the most powerful attorneys in Philadelphia believes that it's acceptable to deliberately mislead the public on behalf of a client?
>
> That it's appropriate to vigorously perpetrate an untruth, as part of his legal obligation?"

---

[12] This Court notes that in Greene v. Street, Mr. Sprague, in representing former Mayor John Street, argued in preliminary objections that Mr. Street's claim that Mr. Greene, a public figure, "lied about everything" was non-defamatory opinion. (See Defs.' Mot. Summ. J. Ex. 22 at 2; Greene v. Street, (Court of Common Pleas, Philadelphia County, Case No. 1212-0303;Control No. 10122978). The trial court accepted Sprague's argument and granted the preliminary objections. Defs.' Mot. Summ. J. & Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. ¶ 118; 2011 WL 10525400 (Pa. Com. Pl. Aug. 4, 2011), aff'd, 60 A.3d 855 (Pa. Super. Ct. 2012), appeal denied, 64 A.3d 632 (Pa. 2013). The trial court wrote, "this statement is a mere opinion based on already disclosed facts. Street was simply stating his personal subjective view and, as such, his statement is not capable of defamatory meaning. Moreover, this opinion was based on facts already in the public purview." Id. The Superior Court denied the appeal of the trial court's decision that saying a public figure "lied about everything" was opinion, not defamation. Id.

29

Ct. Ex. A. She then gave her opinion that even though it "may not be officially unethical under the code of legal conduct, which specifically prohibits misleading a court but not the public . . . . it sure seems underhanded and immoral" to her. Id. Indeed, her point was that she disagreed with lawyers' misleading the public by saying things they did not believe to be true. Mr. Sprague apparently disagrees with her opinion.

Difference of opinion is not legally actionable defamation. "[O]pinion without more does not create a cause of action in libel. Instead, the allegedly libeled party must demonstrate that the communicated opinion may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." Baker v. Lafayette College, 532 A.2d 399, 402 (Pa. 1987) (internal citations and quotations omitted). Ms. Porter's statements in her weekly column were her opinion, and the facts upon which she based that opinion were fully disclosed. There is no dispute that she accurately quoted Mr. Sprague's testimony: "My duty in terms of my client was to convey what my client was saying. Whether I believed him or not was not the issue." Ms. Porter also accurately quoted Mr. Sprague's press conference, where he says that Mr. Fumo sought advice from another lawyer who gave him erroneous advice about whether he had to save documents during a federal investigation and his contention to Congress about "uncontroverted evidence" about this advice. Ms. Porter quoted Mr. Sprague's testimony: "Did I believe it? Of course not." Ms. Porter even quoted Mr. Sprague's rationale: "[A]re you suggesting to this jury that I speak up for my client and at the same time tell the public that I don't believe my client? No lawyer would do that, and you know it."

30

At deposition, Mr. Sprague stated that he did not share Ms. Porter's view: he could not be a liar because "it is my duty, notwithstanding my own opinion, without personal knowledge, to present . . . my client's standpoint." (Defs.' Mot. Summ. J. Ex. 5, Sprague Dep. 397:16–20, Dec. 10, 2012.) Mr. Sprague also said at his deposition, "Well, you have to understand, I personally did not believe it, because of the circumstance of Fumo picking up the phone and calling somebody, exiting the office for a very short period of time, coming back and making the statement that I have said." (Id. at 87:12–19.)

In Ms. Porter's opinion, according to her column, it is "underhanded and immoral" for a lawyer to present as fact to the public something the lawyer does not believe to be true—in other words, to lie. Whether and when it may be morally acceptable to deceive is a philosophical debate as old as humanity itself.[13] Ms. Porter's expression of an opinion different from Mr. Sprague's on this question of morality is not actionable defamation. Ms. Porter gives her readers the facts, so they can determine whether they agree that Mr. Sprague's approach to advocacy involved immoral lying. Ms. Porter quotes Mr. Sprague, and Mr. Sprague bristles at the way her opinions distill and characterize his words and deeds.

Ms. Porter's rhetorical questions represent inferential opinions based on disclosed facts. Ms. Porter's questions communicate not that Mr. Sprague came out and said those exact words but that those conclusions are fairly inferred from what Mr. Sprague did say. Opinion columns are often suffused with rhetorical

---

[13]Immanuel Kant said that it is never acceptable to signal thoughts one does not have. By contrast, Socrates said that a lie that serves the greater good may be moral. (See Lectures on Ethics [Vorlesungen über Ethik] at 27:700 [p. 426] (1924), trans. Peter Heath and ed. Peter Heath & J.B. Schneewind (Cambridge: Cambridge Univ. Press, 1997); Republic II 382b-382d.)

31

questions that fairly arise from disclosed facts. This Court must determine whether a statement is capable of the defamatory meaning that the plaintiff claims it has; if it is not, this Court must dismiss a complaint rooted in such a statement. Baker, 532 A.2d at 402.

Mr. Sprague says that he did not actually utter the words, "I am something of a liar." (Compl. ¶¶ 27–28.) Of course he didn't; if he had, Ms. Porter presumably would have quoted those words in her column. Instead, Ms. Porter quotes his admission that he did not believe his words at the time he said them, and then draws the inference that he was "something of a liar." No fair reading of her column could conclude that Ms. Porter was misquoting Mr. Sprague as having said "I told a lie" or "I am a liar." Mr. Sprague further says that he did not actually utter the contents of Ms. Porter's rhetorical questions. (Compl. ¶¶ 29–30.) But, of course, the column does not say otherwise: Ms. Porter simply quotes Mr. Sprague's testimony, and then poses questions about his actions. Ms. Porter is offering her inferential opinions of the implications of his testimony.

Mr. Sprague further argues that Ms. Porter's quotations of Prof. Robert Tuttle—which are reported accurately—suggest that Prof. Tuttle was calling Mr. Sprague a liar. (Compl. ¶ 36.) This is not a fair reading, either. Ms. Porter first lays out the facts and expresses her inferential opinions about them. Then, after a break in the column signaled by white space and a line, she quotes Prof. Tuttle about *general* questions of truth, ethics, and the law. Prof. Tuttle refers not to Mr. Sprague but explicitly to "lawyers" generally and ethical requirements that govern them:

32

[L]ying in public "is not so clear," said Robert Tuttle, a professor of law at George Washington University School of Law.

Still, it's not considered "honorable" behavior, said Tuttle, an expert on legal ethics.

"And," he said, "here's the important point: It's not something that lawyers are expected to do in defense of your client."

Lawyers have no obligation to violate "ordinary moral standards on behalf of a client," Tuttle said.

When faced with an "awkward question," he said, "there's a big difference between deferring and deflecting a question and affirmatively lying.

"Even if it's not illegal, it suggests something about overstepping this role from somebody offering a lawful service to somebody who feels that their job is to protect this person at all costs."

There is no evidence that Ms. Porter meant for Prof. Tuttle's comments about ethical rules governing lawyers generally were to be understood to refer to Mr. Sprague specifically. The column itself, including the context in which Prof. Tuttle's comments are placed, shows exactly the opposite. Ms. Porter reached her inferences and opinions about Mr. Sprague on her own, and she also presented an opinion on ethics and honor generally by an expert who does not even once refer to Mr. Sprague as an individual or the specific scenario at issue. Indeed, Ms. Porter concludes that it "may not be officially unethical" to "deliberately sell the public a bill of goods." Then she offers what is clearly her own opinion: "[I]t sure seems underhanded and immoral *to me*" (emphasis added).

In his claim, Mr. Sprague does not challenge Ms. Porter's verbatim quotations of his words or account of his actions. Instead, he disagrees with her opinion about the morality of his words and actions. Their public disagreement is not a *factual* dispute; it is a *philosophical* dispute. She disagreed with his approach to lawyering, just as he disagreed with her opinion about his approach. Defamation

33

does not lie for disagreements over opinions or opinions that may not flatter the subject.

E.      Did Mr. Sprague Demonstrate Sufficient Evidence of Actual Malice?

Mr. Sprague's defamation claim also fails because he offers no clear and convincing evidence of actual malice. To make a statement with actual malice is to make that statement "with knowledge that it was false or with reckless disregard of whether it was false or not." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964). Falsity is a necessary precondition to actual malice. See St. Amant v. Thompson, 390 U.S. 727, 730 (1968) (defamation plaintiff has "the burden of proving that the *false* statements . . . were made with actual malice as defined in New York Times Co. v. Sullivan and later cases" (emphasis added)). Because Mr. Sprague cannot show that anything that Ms. Porter wrote was false, he cannot possibly show actual malice. However, even if Mr. Sprague had shown evidence of falsity, he has not shown Ms. Porter wrote anything in the article knowing it was false or recklessly disregarding the truth.

The question of whether a plaintiff has produced clear and convincing evidence of actual malice is initially a question of law for the court:

> "The question whether the evidence in the record in a defamation case is of convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'"

Curran v. Phila. Newspapers, Inc., 546 A.2d 639, 644 (Pa. Super. Ct. 1988) (quoting Bose Corp. v. Consumers Union, 466 U.S. 485, 510–11 (1984)); see also

34

Hepps v. Phila. Newspapers, Inc., 485 A.2d 374, 387 (Pa. 1984) (while existence or absence of actual malice is question of fact for jury in libel action, whether there is sufficient evidence in a case to warrant such finding by jury is question of law for court).

Demonstrating actual malice is a difficult burden because it "implies at a minimum that the speaker entertained serious doubts about the truth of his publication, . . . or acted with a high degree of awareness of . . . probable falsity." Am. Future Sys. Inc., v. Better Bus. Bureau, 923 A.2d 389, 395 n.6 (Pa. 2007) (quotations omitted); see also Garrison v. Louisiana, 379 U.S. 64, 74 (1964); Brophy v. Phila. Newspapers Inc., 422 A.2d 625, 629–34 (Pa. Super. Ct. 1980). The United States Supreme Court has emphasized that the actual-malice requirement is a subjective standard, not an objective standard: showing that a defendant *should have* seriously doubted the accuracy of her story is insufficient. Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 688 (1989). The focus in determining actual malice is not whether the statement was false but whether the publisher knew that the statement was false or probably false when it was published. A plaintiff cannot prevail without clear and convincing evidence of such a "calculated falsehood." Garrison, 379 U.S. at 75. In "determining whether the constitutional standard has been satisfied . . . the court must consider the factual record in full." Harte-Hanks, 491 U.S. at 688.

Furthermore, it is "worth emphasizing that the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." Harte-Hanks, 491 U.S. at 666. Indeed, "[t]he phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will." Id. at

35

n.7. "Actual malice under the New York Times standard should not be confused with common-law malice or the concept of malice as an evil intent or a motive arising from spite or ill will." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 510 (1991).[14] "Actual malice focuses on the defendant's attitude towards *the truth*, whereas common law malice focuses on a defendant's attitude towards *the plaintiff*." DeMary v. Latrobe Printing & Publ'g Co., 762 A.2d 758, 764 (Pa. Super. Ct. 2000) (emphasis provided). Thus, in the absence of evidence of calculated falsity, evidence of ill will and animus (Compl. ¶ 32) are red herrings.

Although evidence of ill will may be considered in determining whether a defendant acted with knowledge or reckless disregard of falsity, Weaver v. Lancaster Newspapers, Inc., 926 A.2d 899, 906 (Pa. 2007), ill will alone cannot meet the legal standard of actual malice. Lewis v. Phila. Newspapers, Inc., 833 A.2d 185, 192 (Pa. Super. Ct. 2003). Writing true things with disapproval or even ill will is not actual malice in the legal sense applicable here. Actual malice must involve knowledge of falsity or reckless disregard of falsity: the subjective entertainment of serious doubts about the statement's truth. The utterance of something *true* with disapproval, or even ill will, therefore cannot be evidence of the "actual malice" legally necessary to support this defamation claim.

Here, however, evidence of any ill will is absent. Mr. Sprague said he was friends with Brian P. Tierney, the head of the ownership group that controlled the Daily News at the time the column was published. (Defs.' Mot. Summ. J. Ex. 7,

---

[14]More specifically, "common law malice" involves conduct that is "outrageous, malicious, wanton, reckless, willful, oppressive, the result of bad motive, or reckless indifference to the rights of others." DiSalle v. P.G. Publ'g Co., 544 A.2d 1345, 1369 (Pa. Super. Ct. 1988) (internal citation and quotations omitted). It also involves "a necessary degree of evil volition toward the plaintiff." Id.

Sprague Dep. Sprague Dep. 68:7–69:20, Oct. 10, 2012.) Mr. Sprague previously represented Mr. Tierney and continued a friendly relationship with him by visiting him at least four or five times since he took over the "running" of the paper. Id. Mr. Sprague claimed that he did not know Ms. Porter personally until her deposition in this case. (Defs.' Mot. Summ. J. Ex. 7, Sprague Dep. 127:19–24; 128:5–6; 128:23–129:1, Oct. 10, 2012.) For her part, Ms. Porter testified that "I don't dislike Mr. Sprague", and "I really have no personal feelings about Mr. Sprague" (Defs.' Mot. Summ. J. Ex. 15, Porter Dep. 167:9, 181:6–9, Feb. 8, 2012). She also testified that she had written articles that were both favorable and unfavorable to him over the years. (Id. at 168:1–3, 134:1–6.) Mr. Sprague cited an email sent to Ms. Porter by her colleague, Dave Davies, after the column had been published: "I like that you led with a hard right to the jaw." (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. Summ. J. 46–47 & Ex. S, Davies Dep. 26:24–27:8, Oct. 16, 2012.) A compliment about an article by a colleague, who had no control over the content of the paper or its publication, made after the article was printed could not possibly be imputed as evidence of malice that Ms. Porter or the publisher published something knowing it was false or with reckless regard for whether it was false. Mr. Sprague's reliance on that comment speaks volumes about the dearth of evidence as to actual malice.

Even if Mr. Sprague were able to show that the statements were false and that Ms. Porter failed to investigate their truthfulness carefully (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. Summ. J. 39–43), these would still be insufficient grounds upon which Mr. Sprague could bring a defamation claim. The United States Supreme Court and Pennsylvania courts have consistently held that mere negligence by a reporter in investigating a story does not amount to actual malice:

> "Mere negligence or carelessness is not evidence of actual malice. A defendant's failure to verify his facts may constitute negligence, but does not rise to the level of actual malice. That is, while it arguably may be negligent not to check independently the veracity of information before publication, this fault does not rise to the level of actual malice."

Reiter v. Manna, 647 A.2d 562, 565 (Pa. Super. Ct. 1994) (internal citations and quotations omitted); see also Bartlett v. Bradford Publ'g, Inc., 885 A.2d 562, 564 (Pa. 2005) (departure from journalistic ideals not actual malice); Tucker v. Phila. Daily News, 848 A.2d 113, 130 (Pa. 2004) (failure to interview plaintiff before publication insufficient evidence of actual malice); Lewis v. Phila. Newspapers, Inc., 833 A.2d 185, 193 (Pa. Super. Ct. 2003) ("a failure to investigate will not alone support a finding of actual malice") (internal citations omitted). The Pennsylvania Supreme Court emphasized this point in Tucker, when the public-figure plaintiffs sued two newspaper companies for reporting that plaintiffs were seeking ten million dollars in damages to their sex life in their lawsuit against members of the music industry. 848 A.2d at 119. The plaintiffs argued that the newspapers failed to investigate the story properly or interview the best sources, ignored a press release by the plaintiffs, and relied on a biased statement by an opposing attorney. The Pennsylvania Supreme Court held that such reporting, even if it was not ideal, failed to establish actual malice. Id. at 135–36. Thus, even if Ms. Porter's actions could be characterized as negligent, for which there has been no evidence, negligent reporting does not amount to actual malice.

Likewise, the U.S. Supreme Court has expressly rejected an actual-malice standard predicated upon "a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily

38

adhered to by responsible publishers." Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 666 (1989) (quotations and citations omitted). Actual malice is a fault standard predicated on the need to protect public discourse from being muffled. N.Y. Times Co. v. Sullivan, 376 U.S. 254, 288 (1964); Tucker, 848 A.2d at 130.

Mr. Sprague has provided no information that Ms. Porter did not investigate the facts behind her comments. Ms. Porter personally attended both events about which she reported, Mr. Sprague's press conference and his testimony at trial. She accurately quoted his statements in both places. He claimed no misquotes or omissions. Ms. Porter did not have to *seek* Mr. Sprague's comments on the matter because she already *quoted* his comments verbatim. Even if she had sought comment, received a denial, rejected the denial, and published the story anyway, that would not amount to actual malice. Harte-Hanks, 491 U.S. at 692 n.37. There was no lack of investigation, there was no falsity, and there was no actual malice.

This Court granted Defendants' summary judgment motion because Mr. Sprague failed to produce any evidence, much less clear and convincing evidence, that Ms. Porter published the comments contained in her column with actual malice—"with knowledge that it was false or with reckless disregard of whether it was false or not." Sullivan, 376 U.S. at 279–80. In addition to not showing that Ms. Porter wrote anything false, he has failed to show any careless or reckless conduct in her reporting nor has he proffered any evidence that Ms. Porter or her publishers harbored any ill will toward him. Ms. Porter's column included Mr. Sprague's own words and Ms. Porter's inferences from and opinions about the implications of Mr. Sprague's words.

39

## F.   Did Mr. Sprague Present Evidence of Recoverable Damages?

Mr. Sprague sought damages, including punitive damages, against Defendants, for reputational harm as well as emotional distress and mental anguish (Compl. ¶ 46). Federal constitutional law limits the ability of a public figure plaintiff to recover damages, including punitive damages, without clear and convincing evidence of falsity or actual malice. However, even if Mr. Sprague had presented sufficient evidence of falsity or actual malice, Pennsylvania law still requires that he provide evidence of actual damages that would entitle him to relief. Walker v. Grand Cent. Sanitation, Inc., 634 A.2d 237, 244 (Pa. Super. Ct. 1993). The most evidence that Mr. Sprague proffered was that the article "upset" him and made him "furious." (Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. Ex. N, Podraza Dep. 71:3–4, 74:8–9, Oct. 9, 2012; Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. Ex. I, Sprague Dep. 160:18–19, Oct. 10, 2012.) Personal upset is insufficient evidence of damages under the law. Thus, the lack of evidence of damages alone supports summary judgment on Mr. Sprague's claims.

Under federal constitutional law, a public-figure plaintiff may not recover damages in a defamation action unless he proves actual malice. The United States Supreme Court in Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., made clear that

> "a public official cannot recover damages for a defamatory falsehood unless he proves that the false statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. In later cases, all involving public issues, the Court extended this same constitutional protection to libels of public figures."

40

472 U.S. 749, 755 (1985) (citing N.Y. Times Co. v. Sullivan, 376 U.S. 254, 271 (1964); Curtis Publ'g Co. v. Butts, 388 U.S. 130 (1967) (internal citations omitted)). As discussed, Mr. Sprague did not submit evidence of falsity and consequently could not show actual malice, and thereby is precluded from any recovery for damages.

Even had Mr. Sprague met his burden of proving falsity and actual malice, he failed to show sufficient evidence of actual damages to entitle him to relief. He provided no evidence of reputational damage even from his own witnesses, one of whom described his reputation as being "greater" after the article. (Defs.' Mot. Summ. J. Ex. 21, Abraham Dep. 54:12–15, Jan. 16, 2013.) Not one witness was offered who claimed to think less of him after the article. Statements that the article was "capable" of damaging a person's reputation (Pl.'s Answer to Defs.' Mot. Summ. J. Ex. A, Abraham Dep. 102:16–19, Jan. 16, 2013), without any evidence that it actually did, are insufficient to constitute evidence of reputational damage. See Walker v. Grand Cent. Sanitation, Inc., 634 A.2d 237, 240 (Pa. Super. Ct. 1993) ("Any defamation action begins with the court's legal determination of whether the spoken words are capable of impugning the reputation of the person who alleges the defamation.").

Mr. Sprague assertions that he was "upset" and suffered "intense emotional turmoil" without more are insufficient evidence of damages under the law. (Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. ¶¶ 19 & 95; Defs.' Mot. Summ. J. Ex. 28, Pl.'s Supplemental Objections & Resps. to Defs.' 1st Set of Interrogs., No. 28, May 12, 2012.) He lacked the requisite expert testimony to attest to his emotional harm. Whether an allegedly defamatory statement upsets one's friends has nothing to do

41

with whether one has suffered actual damages. (Pl.'s Answer in Opp'n to Defs.' Mot. Summ. J. Ex. I, Sprague Dep. 158:17–19, Oct. 10, 2012.) Mr. Sprague sought no damage to his business since he claimed that he currently had more cases than he could handle. (Defs.' Mot. Summ. J. Ex. 5, Sprague Dep. 457:1–3, Dec. 10, 2012.) His personal and family relationships were unchanged by the article. (Defs.' Mot. Summ. J. Ex. 32, Pl.'s Resp. to Defs.' Reqs. for Admis. & Accompanying Interrogs. & Doc. Reqs. Nos. 3 & 4.) Mr. Sprague's own evidence thus undermines the very inference of damages he demands.

In Pennsylvania, damages in defamation cases cannot be presumed. Walker, 634 A.2d at 244. "*Every* defamation plaintiff must *prove* 'actual harm.'" Pilchesky v. Gatelli, 12 A.3d 430, 444 (Pa. Super. Ct. 2011) (emphasis added). "It is not enough that the victim of the statements be embarrassed or annoyed, he must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society." Tucker v. Phila. Daily News, 848 A.2d 113, 124 (Pa. 2004) (quotations and citations omitted). To show defamation, it must be proven that an allegedly defamatory statement "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." Tucker, 848 A.2d at 124. Quite simply, "the law does not protect a person from hurt feelings or individual negative reactions to a particular statement."[15] Rybas v. Wapner, 457 A.2d 108, 110 (Pa. Super. Ct. 1983). Moreover, even if Mr. Sprague were seeking damages for his emotional distress alone, Pennsylvania law requires expert testimony of such harm. See, e.g.,

[15] Mr Sprague points to Time. Inc. v. Firestone, 424 U.S. 448, 460 (1976), for the proposition that a libel plaintiff may recover for humiliation and mental anguish alone, but that case concerned Florida law, not Pennsylvania law.

42

_Kazatsky v. King David Mem'l Park, Inc._, 527 A.2d 988, 995 (Pa. 1987). Mr. Sprague provided none. Mr. Sprague's claims of damages for his emotional distress are therefore unavailing.

A defamation plaintiff cannot recover for reputational damage—real or imagined—or emotional anguish _if the statements that purportedly caused this damage are not false._ Since Mr. Sprague failed to produce sufficient evidence of falsity or actual malice—or, accordingly, damages—summary judgment on his damages claim was appropriate. Even had he met that heavy preliminary burden, evidence that Mr. Sprague was personally upset by the article is insufficient evidence under Pennsylvania law to warrant damages.

G.    Did Mr. Sprague Present Sufficient Evidence on his False-light Claim?

Plaintiff also made a false-light invasion-of-privacy claim about the same statements in the article. (Compl. ¶¶ 49–54.) The tort of false light is based on "publicity that unreasonably places [the plaintiff] in a false light before the public" and involves a major misrepresentation of a person's activities, history, or character that could reasonably be expected to offend a reasonable person seriously. _Strickland v. Univ. of Scranton_, 700 A.2d 979, 987 (Pa. Super. Ct. 1997) (internal citations omitted). "The elements to be proven are publicity, given to private facts, which would be highly offensive to a reasonable person and which are not of legitimate concern to the public." _Id._

Just as with claims for defamation, a false-light tort "incorporates the First Amendment's constitutional protections set forth in _New York Times Co. v. Sullivan_ and its progeny." _Seale v. Gramercy Pictures_, 964 F. Supp. 918, 924 (E.D. Pa.

43

1997) (internal citation omitted); see also Time, Inc. v. Hill, 385 U.S. 374, 389 (1967) (holding that "actual malice" applies to false-light claims). False light liability may not be predicated upon someone's expressed opinion "unless the alleged behavior upon which the opinion was based did not actually occur, or the opinion was far out of proportion with the facts." Parano v. O'Connor, 641 A.2d 607, 610 (Pa. Super. Ct. 1994). For all the reasons already discussed that the defamation claim does not meet constitutional requirements, the false-light claim likewise is deficient.

In addition, Mr. Sprague failed to meet the basic legally required elements for a false light claim because the article did not involve "publicity, given to *private* facts . . . which are not of legitimate concern to the public." Strickland, 700 A.2d at 987 (emphasis added). The facts were not private. Mr. Sprague made the facts public in the first instance. He called a press conference and then later testified at the highly publicized trial. Ms. Porter simply recited word for word Mr. Sprague's public statements and testimony in her column, and then offered her own deductions and opinions based on those non-private facts. Not only did Ms. Porter's column deal with facts that were already public, the topic was of "legitimate concern to the public." Her column dealt with a lawyer's conduct when he represented a well-known state senator in a high-profile public corruption case. Ms. Porter reported accurately that Mr. Sprague admitted to making statements at a press conference about a public corruption case that he did not believe to be true. After that disclosure, Ms. Porter opined that even if the statements "may not be officially unethical under the code of legal conduct" Mr. Sprague's conduct "sure seems underhanded and immoral to me." Ct. Ex. A. Ms. Porter's column does not create

44

a false impression: she reported what had already been said publicly about a public matter followed by her opinion.

As already discussed, Mr. Sprague also did not show that he suffered any financial, reputational, or emotional damages, which are a prerequisite to recovery.

Ms. Porter did not disclose "private" facts: she fairly echoed facts that Mr. Sprague was the first to publicize in a public forum. A trial focused on allegations that an elected official engaged in corruption is a classic matter of public concern. Mr. Sprague did not show the necessary evidence nor did he overcome constitutional requirements for his false light claim, so summary judgment was mandated by the law.

## V.    CONCLUSION

Rather than defending a publisher from libel for comments critical of the governor like Philadelphia lawyer Andrew Hamilton, Richard Sprague charged a publisher for allegedly libelous comments about his own actions in representing a state senator. Libel law today has become what Andrew Hamilton advocated it ought to be during the historic John Peter Zenger trial. Truth is a complete defense, opinions are protected, and where public issues or figures are involved only comments accompanied by malice are compensable. Mr. Sprague's claims lacked sufficient evidence and failed on all of these grounds as well as his inability to show any actual damages.

United States and Pennsylvania courts have held that the Constitution requires that public figures satisfy a higher burden in state defamation claims. Mr. Sprague did not challenge Ms. Porter's verbatim quotations of his words or account of his actions: they were the truth. Instead, he disagreed with her opinion about the

45

morality of his words and actions. Their public disagreement is permitted. Her opinion is not actionable any more than his is. People who are public figures or who speak about public issues may not always enjoy what they read about themselves. They are free to be unhappy. However, absent demonstrating evidence to overcome constitutional protections they cannot extract a penalty from the speaker or publisher.

Mr. Sprague failed to show any evidence, much less clear and convincing evidence, that the published statements were false, were made with actual malice, were actually damaging, or cast him in a false light. His claims are legally insufficient and must fail. Constitutional protections of press coverage of public figures and issues mandated that this Court grant summary judgment due to the absence of the legally required evidence.

BY THE COURT:

Lisa M. Rau,                    J.

Dated: November 1, 2013

46

# EXHIBIT A


CLOUT!

PEOPLE
POWER
POLITICS

Have a
news tip?
Gossip?
Suggestion?

Contact
Bob Warner,
215-854-5885
warnb@phillynews.com
Our fax
215-854-5910

# Obama's campaign owes city 24G and it would be welcome

B ARACK OBAMA spent a record $760 million getting himself elected president. But his campaign, Obama for America, still owes Philadelphia nearly $24,000 for several pre-election events, and the cash-strapped city hasn't given up its collection efforts.

The most expensive event was an Oct. 4 rally on the Parkway, featuring Bruce Springsteen. The city's expenses came to $9,050, including sound systems, lighting, platforms, bleachers and clean-up costs.

There were smaller charges for a series of Obama appearances on Oct. 11, at Progress Plaza, the Mayfair Diner and Vernon Park, and $3,066 for a Joe Biden rally at Marconi Plaza the day before the election.

Mechollo Sabb, special-event coordinator in the Managing Director's Office, said the bills remain unpaid in spite of a December letter sent to Obama headquarters in Chicago, warning that non-payment could jeopardize his welcome at future events in Philadelphia or Fairmount Park.

Calls to the White House press office were referred to Democratic National Committee, which sent Clout back to the White House. No one would talk on the record, but one source said the campaign would quickly write a check to cover the charges.

The city's collection efforts came to light through Adam Lang, 31, a computer-network engineer who lives in the Sharswood section of North Philadelphia. He wanted to test the city's compliance with the state's new public-records law. He asked for the city's records on the Obama rallies, and the Managing Director's Office provided them a week later.

"I commend their response," said Lang, a Republican who challenged U.S. Rep. Chaka Fattah in the November election. "I have absolutely zero complaint."

## Silent watchdogs

With Philadelphia facing its worst financial crisis since it nearly went broke in 1991, you'd think the state board monitoring city finances would be firing on all cylinders.

You'd be wrong.

The Pennsylvania Intergovernmental Cooperation Authority couldn't even approve its own operating budget at a meeting this week, because two of the five board seats are vacant.

The Republican and Democratic leaders of the state Senate each designate a board member. Both the Republican leader, Joe Scarnati, and the Democratic leader, Robert Mellow, are three weeks late with their picks.

In years past, Mellow usually deferred to Vince Fumo on his PICA representative. It isn't clear where Mellow now turns for advice.

A Mellow spokesman said he should have an appointment in the next two weeks. Scarnati's office didn't return two phone calls.

## GOP's pick for D.A.

The city's Republican leaders have settled on Michael Untermeyer, 58, an Old City lawyer and real estate developer, as the party's candidate for district attorney. He's not a Republican — not yet — but he does have political experience, running a credible but unsuccessful race two years ago in the Democratic primary against Sheriff John Green.

Untermeyer grew up in New York City, attending the same Riverdale Country School that educated Ed Rendell. He went on to Sara Lawrence College and Rutgers Law School, in Camden, where he first got a taste of Philadelphia.

Untermeyer spent four years as a prosecutor in the D.A.'s office here, under Rendell and Ron Castille, now chief justice of the state Supreme Court. He spent another 11 years in the narcotics unit of the state attorney general.

"I think the current D.A.'s office has done an excellent job," Untermeyer told Clout yesterday. "I think the approach going forward isn't as much getting tough on crime as much as ... getting smart with the problems, dealing with the budget constraints and finding creative ways to bring additional funds to the D.A.'s office."

His running mate will be Al Schmidt, the GOP's candidate for city controller.

## Ward leader retires

Frank Conaway, Democratic leader of the Northeast's 57th Ward, is giving

See CLOUT Page 91

Untermeyer



Schmidt



Judges Mark Ciavarella and Michael Conahan (left) have admitted taking bribes to send kids to private facility.

# Detention unit flagged

## City stops sending juveniles to Butler Co.

By BRAD BUMSTED
& WALTER F. ROCHE
Pittsburgh Tribune Review

The Philadelphia Department of Human Services has stopped sending juvenile offenders to Butler County for short stays in a private youth-detention facility that is at the center of a judicial-bribery scheme.

DHS Commissioner Anne Marie Ambrose said that she never would have allowed youths on short-term detention to be sent across the state but that Philadelphia Family Court judges mandated use of the facility, Western PA Child Care.

That center and PA Child Care, in Luzerne County, are under scrutiny because two Luzerne County judges admitted in federal court to taking $2.6 million in bribes for placing juveniles there.

Records show that although most placements to the facilities came from Luzerne County judges, other counties, including Allegheny, Butler, Beaver and Westmoreland, sent children to the centers.

Philadelphia has paid $16.6 million since 2005 to place youths at the facilities, records show.

See JUVENILES Page 91

# The law, duty & truth

L AWYER RICHARD Sprague may have reveled in plunging the blade into his now-enemy Vince Fumo this week.



JILL
PORTER

But he didn't do himself any favors.

Sprague, once Fumo's beloved mentor and best friend, labeled Fumo a liar when he testified at Fumo's trial this week.

But he acknowledged that he was something of a liar, too.

Sprague admitted that after Fumo was indicted in 2007, he made statements to the public and to a congressional committee that he didn't believe were true.

"My duty in terms of my client was to convey what my client was saying," he testified.

See PORTER Page 12

Case ID: 100102930
Case ID: 1001029
Control No.: 11023398

·OR..=R
·xtinued from Page 6

·is week.

"Whether I believed him r·not was not the issue."

So one of the most powerful attorneys in Philadelphia believes that it's acceptable ) deliberately mislead the public on behalf of a client?

That it's appropriate to vigrously perpetrate an untruth, as part of his legal obligation?

That's sure to enhance the redibility of lawyers — such s it is.

Sprague's posturing on Fumo's behalf may not be offiially unethical under the ode of legal conduct, which pecifically prohibits misleadig a court but not the pub.

But it sure seems underinded and immoral to me.

Fumo is charged with, mong other things, obstrucm of justice for deleting mat°  ·tinent to a federal rr·  investigation that

he knew was under way. .

Fumo claims that Sprague and another attorney told him that it was legal to purge the information, despite the investigation, because he hadn't personally been subpoenaed.

Sprague testified on Wednesday that he had told Fumo no such thing.

But he acknowledged having written a letter to a congressional investigating committee that there was "uncontroverted evidence" that another lawyer had given Fumo such advice.

And he insisted the same thing at a 2007 news conference he called on Fumo's behalf, which I attended.

"Senator Fumo went and sought advice from a lawyer — not me — on whether to change his policy" of routinely deleting e-mails, Sprague said at the news conference.

"That lawyer told Senator Fumo, 'No, you don't have to change your policy 'because you haven't been subpoenaed.' "

In court this week, Sprague contemptuously dis

missed the idea that Fumo had been given such legal advice.

"Did I believe it?" he said in response to a question from Fumo's attorney, Dennis Cogan.

"Of course not."

Cogan chided him for not acknowledging that he didn't believe Fumo.

"Mister Cogan," Sprague said indignantly, "are you suggesting to this jury that I speak up for my client and at the same time tell the public that I don't believe my client? No lawyer would do that, and you know it."

But not every lawyer — or so you'd hope — would deliberately sell the public a bill of goods.

———

Lawyers are clearly prohibited from lying in court and in sworn testimony before, say, a legislature.

But lying in public "is not so clear," said Robert Tuttle, a professor of law at George Washington University Law School.

Still, it's not considered "honorable" behavior, said Tuttle, an expert on legal ethics.

"And," he said, " here's the important point: It's not something that lawyers are expected to do in defense of your client."

Lawyers have no obligation to violate "ordinary moral standards on behalf of a client," Tuttle said.

When faced with an "awkward question," be said, "there's a big difference between deferring and deflecting a question and affirmatively lying.

"Even if it's not illegal, it suggests something about overstepping this role from somebody offering a lawful service to somebody who feels that their job is to protect this person at all costs."

So while Sprague may feel triumphant this week about being able to inflict damage on Fumo, he didn't do himself any favors, either. ✶

E-mailporterl@phillynews.com or call 215-854-5850. For recent columns: http://go.philly.com/porter

# Fumo trial wraps up.

By MICHAEL HINKELMAN
hinkelm@phillynews.com
215-854-2086

A lawyer who told then-state Sen. Vince Fumo he could continue the "normal course of district office business" after a nonprofit organization that he founded was served with a grand-jury subpoena in April 2004 said under cross-examination yesterday that did not mean Fumo could delete e-mails.

The advice was in a February 2006 letter the lawyer, Robert Scandone, gave to Fumo's then-defense lawyer, Richard A. Sprague, who was preparing Fumo's defense.

Sprague, who had a falling out with Fumo in 2007, testified Wednesday that Fumo told him at a January 2006 meeting that he had been advised by Scandone that he could destroy e-mail evidence during an FBI corruption investigation so long as he hadn't been subpoenaed.

Fumo attorney Dennis Cogan asked Scandone what he knew about a long-standing office policy Fumo had regarding deletion of

See FUMO Page 31

Won't you join us on

# FRIDAY, FEBRUARY 20, 2009

at the

## PHILADELPHIA LODGE #5 FRATERNAL ORDER OF POLICE LOUNGE

1336 Spring Garden Street, Philadelphia, PA 19123

## WE WILL BE HOLDING A BENEFIT BEGINNING AT 5:00PM to 10:00PM

# $15.00 p/p

(draft beer and food included)

## IN HONOR OF OUR FALLEN HERO

# POLICE OFFICER
# JOHN PAWLOWSKI

## ALL PROCEEDS OF THIS EVENT WILL GO TO OFFICER PAWLOWSKI'S FAMILY

*Remember to Vote NO in November on the Retention of Judge Craig Washington, the Judge Who Dishonored Officer John Pawlowski.*



Case ID: 10010293
Case ID: 10010293
Control No.: 11023339